Please proceed. Good morning. May it please the Court, my name is Andrea Rogers, and I represent the petitioners in this matter, the Snoqualmie Indian Tribe. And before I begin, I'd like to recognize members of the Snoqualmie government who are with us here today, Chairman Bill Sweet, Chief Jerry Enoch, Sub-Chief Nathan Barker, the Snoqualmie Falls Ambassador, Lois Sweet-Dorman, and the Honorable Snoqualmie Tribal Council Members. Thank you. Welcome to the Ninth Circuit. And I'm hoping to reserve three minutes for rebuttal. Yes, I understand. I have a color-coded timesheet here, and I'm going to try and stay within your limits. Okay. The Snoqualmie Indian Tribe is a federally recognized Indian tribe with a reservation located just outside of North Bend, Washington. And this case presents important legal questions concerning the desecration of a sacred site. The briefing in this case goes into great length about the religious and cultural importance of Snoqualmie Falls. Counsel, if it will save you some time, we have very carefully read all of the briefs that all of the parties have circulated, and we've looked at significant portions of the records. So if you want to get right into your legal argument, and let me just toss out a question for you and work it into your argument As I understand it, the tribe was not federally recognized until after the record closed in this case. Is that correct? No, that's not correct, Your Honor. The tribe, the initial recognition came down in 1997, but wasn't finalized by the Secretary of the Interior until 1999. The license in this case was issued in 2004, five years after that. That's true, but the actual record itself, which I assume is closed when the programmatic agreement is circulated, was two years before 1997. And that is the National Historic Preservation Act consultation process. It's FERC's position that that closed upon finalizing the programmatic agreement. So there's a dispute between your clients and the government over what the legal significance is of the programmatic agreement. Is that what you're telling us? Exactly, but consultation is not only required under the National Historic Preservation Act, Your Honor. It's also required under the Commission's own regulations. I'm not looking at consultation per se at this point. I'm just trying to understand as a matter, I guess, of what's in dispute here, what your position is with regard to when the record closed, and then we can decide what the legal significance is. Yeah. Our position is that the Commission's obligations in regards to consultation closed when that license was issued in 2004. I think, even though it is addressed in the briefing, I think it's important to note that the spirituality of the falls cannot be reduced to the written word. And it's very important that the Court understand that the connection that the tribe has to the Snoqualmie Falls, I think that a testimony from one of the public hearings says it best when the Snoqualmie Tribal members said, I am part of Snoqualmie Falls and Snoqualmie Falls is part of me. And is that connection that is desecrated by the existence and operation of the Snoqualmie Falls Hydroelectric Project? Now, can you clarify that? It seems to be that the mist plays the central role in the dispute. There is water flow. The question is the degree to which that flow generates the appropriate amount of mist. And I think I understand from the FERC's ruling that they seem to feel that they were presented with an all or nothing kind of argument by the tribe. That is, they wanted the falls restored to total natural flow. Is that correct? That you can't generate enough mist with something less than stopping any diversion? Can you just clarify, in other words, what is the parameter of what, because FERC did increase on your motion for review here, and did increase the flow, but you say even that isn't good enough. That's correct, Your Honor. I think your question illustrates the difficulty with a religious freedom case. It's not easy to put the tribe's religious beliefs down on paper and to categorize them. And what we did in our briefing and what the tribe attempted to do, and it's really demonstrated by their partnership with the Snoqualmie Falls Preservation Project and the church organization, was to try to give some cross-cultural understanding for what their beliefs are. Because being intertwined with the natural environment is foreign to most people in today's culture. Now, the mists are certainly part of that, and the mists really are what, and again, this is from the tribe's beliefs, that the mists connect the heavens and the earth, and it is that which is part of the spiritual connection. I think we do understand that. We do understand that. And RFRA does set up a structure where, in this case, a tribe's religious beliefs have to be respected, and there has to be a concern about substantial burden. But then it says if there's a substantial burden, then there's more to the analysis, and that is least restrictive means being one of the second-tier inquiries. And so what I'm trying to find out is, is the tribe's position that if there is a finding of substantial burden, that the only alternative is to eliminate any diversions from the falls? Well, I think, Your Honor, the tribe's belief is that its religion depends upon natural flows at the falls. Now, it does not have the obligation to compromise its religious beliefs. I'm not asking you to compromise. I'm just asking what your position is. Yes, and our position is that... So the position is it should be all prior diversions should be stopped. That's correct. To total natural flow. That's correct. Okay, thank you. That's correct. Now, it's important when you look at the burden shifting and why it's the government's obligation to look at the compelling state interest and least restrictive... I'm not suggesting otherwise. I just wanted to know what it was, the tribe's position. No, I understand that. I just think it's important so that they do not compromise their religious beliefs. Now, getting right into the arguments in RFRA, which are really the heart of this case, especially from the tribe's perspective, I think the legal error that the commission committed in this case is demonstrated by its reliance solely on LING and LING's requirement that incidental burdens on religion cannot constitute substantial burdens. And I think the cases are very clear that incidental burdens can be just as substantial as direct burdens. And that's in the plain language of RFRA itself. The first place that happens is in Sherbert where the Supreme Court says incidental burdens can be just as significant as substantial burdens. And most recently, this court in War Soldier also recognized the fact that incidental burdens can be just as substantial as direct burdens. Ms. Rogers, is it your position then that LING itself is correct insofar as it states what the law is concerning incidental burdens, but that as a matter of fact, in this case, it's a substantial burden, not an incidental burden? Well, if I understand your question correctly, I think what LING did, I think LING correctly states the law in regards to First Amendment legal analysis. I think it incorrectly states the law in regards to RFRA. RFRA really was sought to overturn the whole basis of what the LING decision says, that you focus on the character of the governmental action that's burdening religion. And LING is quite clear that that's what it did in that case. And the majority opinion in Smith recognizes that fact. So I don't think the incidental burden language in LING survives RFRA. Now, LING also established this coercion test. I think in certain circumstances, if there is governmental coercion, coercing an individual to violate their religious beliefs, I do think that can constitute a substantial burden. And the best example of the governmental coercion or pressure really comes in the form of the prison cases, where you have grooming policies. And there, because the inmate is confined, it's very easy to show that there's governmental pressure. But it's an example, but it's certainly not the whole universe of what constitutes a substantial burden. And I think that's why this Court interpreted those terms quite broadly in the San Jose Christian College case, where they interpreted substantial burden to be a significant restriction or onus on one's ability to practice their religion. Now, I think it's those broad terms that RFRA should have applied in this case, because substantial burden is plain on its face. But they just didn't do that, Your Honor. Just touching also on the National Historic Preservation Act argument, and the commission contends that direct consultation simply could not have occurred in this case, even though the tribe is a federally recognized government, and their argument is based upon the ex parte rules of the commission. And I think it should be noted that in the record, early on in this case, there was some movement to get the commission to work with the Washington Department of Ecology and to come up with an aesthetic flow regime, essentially a flow regime that tourists would enjoy. And in those discussions, in the record, it does say the commission recognized that the ex parte rules constrained their conduct, but that they would be able to work in an alternative dispute resolution process with ecology and other interested parties on flows. So I imagine the same type of thing could have happened in consultation with the tribes. I assume that the flow of the falls is to some degree dictated by nature. I mean, there are going to be instances where there's been a lot of rain or a lot of snow melt, and the falls is going to be quite heavy, and other instances where it's just going to be down to a minimal flow. In fact, I think I've seen it both ways, actually. Well, you've always seen it with a hydroelectric project in place. I'm sure that's right. I completely agree. I mean, I didn't even know there was a hydroelectric project there. I mean, I was just there for a judicial conference. Yeah, and that's why you're under the tribe's religious beliefs. It's about the natural flows. It's about the natural connection that the creator put on this earth, that that is that cycle that's important there. All right. Do you want to save the rest of your time? I would like to. Thank you. Good morning, and may it please the Court. My name is Mark Schneider, and I represent Puget Sound Energy in this matter. In response to the Court's questions of counsel and the issues raised in the brief, I'm going to focus on three issues under the Religious Freedom Restoration Act. Number one, the question of substantial burden. Number two, the question of compelling interest. And number three, the question of least restrictive means, because that is the test under the Religious Freedom Restoration Act.  Yes, Your Honor. In footnote 41 and footnote 42 and in paragraph 36, what FERC did was lay out what the test is. It cites in footnote 41 what the correct legal standard is. In footnote 42, it correctly states that RFRA was designed to reinstate the compelling interest test of Sherbet and of Wisconsin v. Yoder. And then in paragraph 36, they lay out the inquiry that they will be undertaking. And the inquiry they asked in this case was, is the issuance of the license order going to require the adherents to modify their conduct and violate their religious beliefs? That's the test that this Court has laid out in its most recent RFRA cases. That's the test it laid out in the Guam decision in 2002, the test that this Court laid out in the war soldier decision in 2005. So that was the question that FERC asked. It asked the right question. It applied the right legal standard. It then, taking the right legal standard, it then made findings of fact that there was no substantial burden to the tribe's religious exercise. And it made findings of fact that were based on substantial evidence. FERC found three things. Number one, FERC found that the issuance of the license order would not require the tribe to violate its religious beliefs. That factual finding is set forth in paragraph 36 of the order. FERC went farther. FERC found also that the tribe would be able to maintain its access to the falls and engage in its religious practices at the falls. That's also in paragraph 36. And then, finally. May I ask you a question, please? Yes, Your Honor. Judge Fisher just asked what I think was probably the most pertinent question one could ask on this side of the bench, and that is whether the tribe believed and still believes as part of their religious tenets that the natural flow of what I guess would be considered by them a life force would be okay if it was somehow restricted and so forth. And they said no, that in order for them to exercise their religion, this has to be a natural flow subject to the natural whims of Mother Nature, if you will, that sometimes it will be big and heavy and with a lot of mist and other times it won't be. How could FERC possibly suggest that if that is the case and that's their religion, and I don't think FERC's in a position to redefine their religion for them, if that is their religion, that cutting off the flow of the falls would somehow not substantially impact their religion? That would be like telling a Catholic, well, we've decided that it isn't important for you to go to Mass on Tuesday and Wednesday because you can go on Sunday. I mean, I don't understand how they came to this conclusion. I believe how FERC came to the conclusion was based upon the evidence in the record, and let me cite the two portions of the record that constitute more than substantial evidence on the question. Item number one is administrative record item number 75 on Puget's excerpt of record pages 700 and 705. This was the nomination form that the tribe submitted in 1992 when there were the reduced flows far less than the flows ordered under the license order. And so during that time in 1992, the tribe submitted an application to have the falls preserved, and in the form it says, quote, and it's a quote, today the view is largely unchanged from a century before, and the majesty of the falls, the roar of its current, the mist rising from the pool, and the mossy cliffs which rise on three sides still convey the traditional setting of a site which has played a continuous role in the culture of the Snoqualmie people. So that was one piece of substantial evidence. Here's another on page 705. Quote, this is from the tribe's application in their description of the falls. Quote, even so, the falls continue to maintain a sufficient average volume of flow so that it is recognizably the same site and continues to play an important role in traditional life. And there's more evidence, Your Honor, in administrative record number 75, pages 666 and 695, in the 1993 report prepared by Dr. Tollefson, the tribe's cultural anthropologist. Dr. Tollefson conducted interviews, he conducted studies, he looked at the oral history, and he concluded, quote, presently, the falls provides a place for the contemporary Snoqualmie to gather, to pray, to meditate, to worship, and to renew their contact with their ancestors and their spiritual powers. That's on page 666. Just a few pages later, he concludes by saying, quote, this study demonstrates that despite some 1.5 million tourists that visit the falls each year, the Snoqualmie Indians still respect the falls as a sacred site and continue to use it for their religious experience. And so the substantial evidence that FERC relied upon was evidence supplied by the tribe itself. Because of that finding, because of the finding that the tribe would not be compelled to violate their belief and they could still maintain their religious practices, FERC properly found, based upon substantial evidence, that there was no substantial burden. Let me turn, though, to the next inquiry. Let me make sure I understand your argument, counsel. Are you suggesting, then, that the representation that Ms. Rogers just made to us is a new position that has changed since 1992 with regard to the tribe's view of the importance of a natural falls? No, Your Honor. Throughout the proceedings, the tribe has asked for, as I believe one of the panel members said, an all-or-nothing situation. What FERC did, though, is it was saying in 1992 that they wanted the project to be decommissioned. Were they not? They were saying that's correct. What FERC found, based upon the substantial evidence, is there would not be a substantial burden. Let me turn to that question, though. Let's assume that this panel finds, contrary to the factual finding of FERC in paragraphs 36 and 39 of its order, let's suppose this panel finds that, in our view, contrary to the evidence, there was a substantial burden. The order is still proper because it advances compelling governmental interests, and it does so in the least restrictive means. There's three compelling interests identified in the order by FERC. Number one, FERC recognized the critical need for a reliable energy source to meet the region's growing energy needs. That's finding effect in 64 and 68. Number two, FERC recognized the importance of avoiding the use of limited fossil fuels and instead relying upon the clean, renewable power of the falls. That's factual finding 37. And then finally, and this was significant at the time of the 2004 order, but given the headlines over the last week, it really is even more significant. FERC found that the use of power from Snoqualmie Falls was far preferable to the use from other sources, which would lead to increased greenhouse gases. That's in factual finding 37. And those findings about compelling governmental interests are supported in the record. For example, the Northwest Power Planning Conference, this is AR 130, pages 942 to 946, they submitted a report demonstrating that there was a compelling need for additional power sources and that the falls would provide a means for meeting those needs for additional power. And then very significantly, FERC found itself in its final environmental impact statement. This is the administrative record number 1074, page of the experts for record 1698. It did a study and it compared what the environmental impacts would be from creating power from the Snoqualmie Falls versus other sources. Well, isn't this what the Snoqualmie Nation is concerned about, that all of a sudden these people are going to ramp this up and pretty soon they're going to get, you know, what looks like nothing coming through there? And that's what the license order protects. And that goes to the least restrictive means, which I will turn to in just a moment, Your Honor. What the FERC found was it said if one were to take the power generated by the Snoqualmie Falls, the alternative would be to go to other sources of energy which create greenhouse gases which lead to the greenhouse effect. That is certainly a very compelling governmental interest. It also looked to what the alternatives would be to create new sources of hydropower, and it determined that the environmental impacts would be far more significant if a new hydropower plant was constructed. So FERC found that there were compelling interests to, even if there had been a substantial burden, and we believe the evidence established there has not been, FERC found that there were compelling interests. Let me turn to the last portion of the test, and that's the least restrictive means. If someone can demonstrate a substantial burden, then the government must advance compelling interests that are advanced in the least restrictive means. And here FERC met that test. Judge Ezra, your question points out Puget Sound Energy is not allowed unfettered use of the falls. It is very limited in the amount of water it is allowed to use. What FERC did is it took the existing flows in 1991 and increased it by four and five times, 400 to 500 percent. So there's far less power available for the use of hydropower. But in addition, FERC conditioned the issuance and the license by precluding any development of the fall, any developments in the area on the south side of the river downstream of the falls. It precluded the extension of the Snoqualmie-Preston Trail and significantly it said that any construction activities must be inaudible. It must be invisible in areas where the tribe were conducting their sacred rituals. I understand, but your argument is that they went too far, isn't it? Yes, Your Honor. If I had more time, I would turn to that as well. We understand. Yes, yes. But you think they went even more, they should have been not as restrictive as they were. Exactly, Your Honor. We think that they got it right when they issued the license order in 2004. They made the proper determinations under RFRA. They followed the necessary practices. They identified and balanced the interest, and they issued a very carefully tailored order that did balance the interest and was an appropriate balancing. Did they formulate it in the terms that you did as the least restrictive and the compelling governmental interest? I understand they engaged in more of a balancing. They engaged in the balancing, Your Honor, because that's what under the Federal Power Act Section 10 they required to do. That may be, but RFRA calls for the formulation you say they have made all these findings under, but that's not the rubric that they were making the findings under. No, Your Honor. With respect, I would disagree with that characterization. If one looks to footnote 41, footnote 42, and paragraph 36, they are asking those questions specifically under RFRA. They did not use, and so that was for the substantial burden test, and it's our view that based upon the substantial evidence, there was no substantial burden. As to the remainder of the test, they did not use the word compelling interest or least restrictive means, but the factual findings they made demonstrated that it was a compelling interest and the least restrictive means. I see I have 15 seconds left. I'd like to reserve that, if I could, for rebuttal. All right. Thank you. Sure. Good morning, Your Honor. I'm Michael Kaufman for the FDRC. I'd like to get right to some of the points that were raised. Specifically, this was not primarily and singularly a RFRA case. This was a Federal Power case, as far as the FERC was concerned, and its first responsibility was administering the Federal Power Act, which under two of its major portions require it to balance. It had to find out that the project, as licensed, was best adapted to a comprehensive plan for developing a jurisdictional waterway for beneficial public uses. That's under 10A of the Act. And under 4E, it has to balance and give equal consideration between power development values and non-power development values, and this is what the commission was faced with here. I understand that. Then you have another statute that comes along. That's correct. So our job imposes another set of obligations, which FERC recognized and cited, but then it doesn't translate. It does its Federal Power Act analysis, but it doesn't then say and it also satisfies the RFRA because we find that there's no substantial burden. They quote it, but then it's not clear what they're applying, and that's, for me, as I've gone through both of their orders, I'm having a little trouble sorting out what standard they were applying. And if RFRA imposes somewhat greater constraints than the Federal Power Act balancing process might, then what do we do with that? Well, that's correct, but let me see if I can help us here. Our job here was to try to, in fact, walk that very narrow line, balance these very divergent interests. You have Puget Sound Energy saying we went way too far in trying to accommodate the religious needs of the tribe, and we have the tribe on the other part of the scale saying that we went to the point of actually obliterating their religion. We are in the middle trying to say we have to balance all of these and are compelled to balance all of these interests without going against RFRA or the Clean Water Act here, and we think we did that. And part of the reason, I think there may be a little bit of confusion in the orders, has to do with how they were pleaded in the request for rehearing. Initially, when the tribe raised these religious issues to the commission in their request for rehearing, they went to great lengths to talk about Ling, and then distinguished Ling on the First Amendment, saying that Ling was misapplied by the commission under these facts. Factually, we got it right, not necessarily that Ling was bad law, but that the commission misapplied Ling. And then right at the very end of that section of their request for rehearing, there was literally one paragraph where they said, and by the way, you violated RFRA, and these are the elements of RFRA, and then it went on to the next argument. So there was really no in-depth discussion about RFRA. So in the orders, the commission first dealt with the First Amendment issues in the context of Ling. Then, as Counsel for Puget just said, the commission addressed RFRA by citing the strict scrutiny cases, which it did in footnote 42. Right. And then on rehearing, had to go into it a little bit more because they're the tribe. I'm sorry, on the rehearing orders, again, the tribe focusing so much on Ling, that was part of the focus of the commission, but not necessarily improperly conflating those two standards. So looking at what the case law is in this circuit in terms of the compulsion aspects of substantial burden, when the commission said that this was an incidental impact on the quality of the religious experience of the tribe, this is in stark contrast to the law under RFRA, which says that substantial burden means something that is a significant imposition or compulsion to somebody to do something they're not allowed to do or preventing them from doing something that they must do. And so here the commission found that there wasn't a substantial burden, so having found that, they didn't then go to the next steps. But as Counsel for Puget said, that even if you were to go there, there is enough evidence in the record and in the order's findings to say that, in fact, compelling government interests were advanced by the issue of the license, number one, and number two, that it was done in the least restrictive way possible. And this is a very critical point. You have asked ñ I just want to understand because it's helpful to understand how FERC came about this. If you look at the discussion of RFRA at ER 2157 and footnote 42, in 41 it says it characterizes the RFRA as saying that federal activities which inhibit the free exercise must satisfy. Okay. Now, inhibit isn't the word of the statute. It's substantially burdened, correct? That's correct. Okay. But you say we should read inhibit as substantial burden? Well, if you look at the cases here, Goring v. Brophy, you're talking about the interference with religion must be more than an inconvenience. The burden must be substantial and interfere with the tenet of the belief that a central ñ  What are you reading from? I'm reading from Goring v. Brophy. I'm just saying the standard for RFRA of what is substantial burden talks about a substantial interference. So when the FERC order talks about an incidental affecting the quality of religious experience, you need to take that into context with what this Court has said the test is for substantial burden. That's why I was directing you to 42, because 42 doesn't cite ñ it cites what May v. Baldwin, I guess. So that was ñ 42, sorry? 42 cites Sherbert v. Vernon. I know it cites the Supreme Court, but you cite to this circuit's authority. I just want to know where ñ what was the ñ what was FERC looking at in terms of this circuit's law, its articulation under RFRA? Well, I think in citing those two cases, those are specifically the cases that RFRA mentions that RFRA was intending to reinstate when analyzing the issue. I understand that. Those ñ as much as we'd like to be the Supreme Court, sometimes we're not. So I'm just trying to understand, in FERC's view, what was it adopting as the circuit's standard for RFRA's substantial burden? Well, I ñ What was it looking to? What's cited in footnote 42? Specifically for RFRA, yes, what's cited in footnote 42. Okay. That's what I was ñ that was my question. Yes. Okay. Ling was discussed in the context of First Amendment.  And RFRA in the context of these cases here in 42. Okay. But let me make what I think is a very important point. And this was a question that you had in terms of whether or not the remedy is all or nothing. If you look at all of the cases which talk about RFRA and substantial burden, in almost every single one of these where it's been held against the government, it's because there was some narrow remedy that was available. If you look at the Peyote cases, you have the ability of having a limited permit for certain religious practitioners to use sacramental peyote or American bald eagle feathers, the same thing. You can have a very narrow exception to say we have a law of general applicability, there's a religious issue involved here, and we can fix this with a small fix where the government hasn't done that, the courts have said you really should have done that. Or in the case of the prison cases, things about heritage. But if the religion requires them to have a natural flow, anything short of that is going to violate their religion, isn't it? That is their argument, but I think we're also missing a very important part here, which is these orders, the new license, substantially enhance flows compared to what they were under the last license and compared to anything what they were since 1897. So you're going back to this 1991, I guess, declaration by the, I guess they were a tribe, they weren't a nation at that point, where they said some euphemistic thing about how beautiful it is or something. We cited to this in our brief. There's substantial evidence in the record coming from the tribe itself which talks about the continuous and continuing use of the falls for the religious purposes. They were not saying that they are being prevented from practicing their religion. They are not saying that they are not being granted access. They are saying that under the past license scenario, the more restrictive one, even under that scenario, they were practicing their religion. See, it doesn't seem to me like the 91 declaration by them is some kind of an admission against interest. It seems to me like they were at that point simply trying to preserve what they had. And so they said, yes, you know, don't denigrate it further because this is what we. Well, I think there's some truth to that because in the initial application, Puget had applied to increase the power there by getting a larger water right, which would have, in fact, decreased flows from where they were in the past license. In the evolution of what happened in this case, that was discarded. So in your view, you gave them three quarters of a loaf and they should be happy about that? Well, what I'm saying is that there's actually an enhancement beyond which anything that's been there since 1897, and it was done specifically because we heard the tribe. The tribe came and said, this is something that's very important to us. We under the FPA have to balance the power issues and the non-power issues. This is one of the non-power issues. We had the first order, which adopted the Water Quality Certificate flow regime. And on rehearing, we heard the tribe and said, look, this is something that's very, very important to them. We want to try to give them as much as possible without violating our obligations under the FPA. And at least for two months of the year, the flows are 1,000 cubic feet per second. And under the prior license, which this license replaces, the highest flow that was there was 100. So this is a significant improvement for the tribe. I understand their position. It's not as much as they would like, but we have to do our duty. I'm not arguing with you. I'm just trying to understand where FERC was coming from here. Mr. Coffman, as I understand the argument, are you saying then that where the two acts of Congress may collide, the Federal Power Act and the Religious Freedoms Restoration Act, that FERC arrived at a solution which is the least restrictive means available, given the alternative the tribe requested, which is the complete decommissioning of the project, and that in essence what the government is arguing to us is that RFRA doesn't trump the Federal Power Act, that it would not require in the extreme case the commission to simply tell Puget Sound Energy, you have to shut that project down and restore the site to its natural flow? Is that what you're arguing? What I'm arguing is that to the degree that these statutes can be harmonized, they should be, and I think that the action that the FERC took here, based on substantial evidence, and again if you look at the final environmental impact statement, they looked at eight different flow regimes, and flow regime C, which is ultimately where this final flow regime came from, was one that the evidence showed satisfied the greatest constellation of interest. To the extent possible? To the extent possible. Because the only other alternative that I heard from the tribe's lawyer was, you simply should have denied renewal of this license and decommissioned the project. That's correct, and we refer to this as a delicate balance that was struck here. There was evidence in the record that said if you look at all the interests that were being weighed here, that to completely satisfy any one of them could in fact destroy the interest of some other ones. So the idea of the Federal Power Act is to look at all sides and try to strike a balance which satisfies to the greatest degree possible, supported by substantial evidence, that does that. In this case, we believe that these orders do, number one. And number two, even having done that under the FPA, when you look at RFRA, that one, there really was not a substantial burden on their exercise of religion. We are not preventing them from doing anything. We're not compelling them to do anything. And you go back, as previous counsel suggested, to this 1991 declaration. Is that right? We cite that as well. Okay. All right. Thank you very much. Good morning. May it please the Court, I'm Joan Marchiora with the Attorney General's Office representing the Intervenor Washington Department of Ecology. And that's the Attorney General of the State of Washington. Just since you're following FERC, we'll just make it clear for the record. We understood. Okay. Thank you. The issue in this case is not related to the application of the Clean Water Act. FERC has no authority under the Clean Water Act, and FERC has not amended Ecology Section 401 Water Quality Certification. The Clean Water Act does place a responsibility on FERC. Under Section 401D, FERC is required to incorporate, as a condition, in full any water quality certification issued by a state. And FERC has done that in this instance by incorporating Ecology's water quality certification into the license issued to Puget. So you're happy with what was done here? Yes. And you support it? Absolutely. And if the RFRA issue should turn out that, I'm not saying we will, I'm just saying, but if the court were to find or conclude that RFRA hadn't been appropriately implemented here and sent it back, and the issue before the FERC then was the position, again, that all water flow should be, interference should be eliminated, so restored totally to natural flow, then would your position be reactivated that you might have a concern, a water quality concern? There would not be a water quality concern because what you would be doing is returning nature to itself. Now that gets to the question as to whether Puget's arguments as to whether hydropower production is a beneficial use under the Washington's water quality standards and the anti-degradation policy. Our briefing, Ecology's briefing, rejects that argument. I think RCW 9054.02.0 or 03.0 specifically pulls those two apart. And when you look in the application of the anti-degradation policy in both our water resources laws and the water quality laws, it is recognized as a beneficial use of water for water resource allocation purposes but not a beneficial use in its precise terms as hydropower production as a beneficial use that's protected for water quality purposes. Yeah, so you're basically just looking at water quality. You're not looking at the religious aspect of this one way or the other. Not at all, and, Your Honor, when the tribe came to Ecology during the process of the 401 certification, we received the same input from them that they would like to see natural flows. Ecology, in balancing the beneficial uses, did consider that there are out-of-stream uses such as a hydropower production, but there are water quality uses, and that was the focus, the water quality of the 401 certification. I just wondered if something on the RFRA side might then affect, even though it's not your concern, but the effects of a natural flow would create any water quality problems. In returning nature to its natural course, it should not cause water quality because nature would then adapt to that natural course. Okay, thank you. All right, thank you very much. Okay, I think there's some reserved save time here. Your Honor, in the short time we have, we will just waive argument and rely upon our papers. Fine, thank you. Just a couple points I want to touch on real quickly. About the tribe's position being characterized in this case as all or nothing, I think it's important to point out that this case is really a procedural case, and what we're asking at this time is that the commission comply with its legal obligations under RFRA. No, we understand. We understand. Okay. That was a shorthand way of just summarizing, as opposed to some compromise where, as FERC attempted to do, they tried to increase the flow, and I just want to get clear that the tribe believes that it should be returned to the natural state. Exactly, and I think that also goes to the continual use argument that you hear and have read about in their briefs, and I really think that's their interpretation and their worldview. From the Snoqualmie's beliefs, they have to continue to treat the Falls as a sacred site, because if they don't, they're not Snoqualmie. Counsel, let me ask you this question. They have cited as evidence that there is no substantial impact on your clan's religious beliefs, their 1991 declarations with respect to, and you heard them. How do you reconcile that, or what is your view of that? I think maybe Judge Tallman suggested or asked whether there was a change of views. Yeah, there was never a change of views. The tribe has always held the position that it needs natural flows over the Falls in order to restore that sacred connection. Now, the information that they're citing is continual use. I think it's important to look at each of those citations individually, because at least one of the documents and some of the documents didn't even discuss Snoqualmie Falls, and that's because of the cultural prohibition on disclosing this secret and sacred information, and that is something that FERC never addressed throughout this entire hearing, and which is extremely important, because there's cultural prohibitions against disclosing this kind of information, and there needs to be a way to discuss that. What kind of information? Without you disclosing it. Yes. I'm talking about the information concerning the tribe's religious beliefs, and that's why you've seen it several times. But it certainly isn't secret that the tribe feels that the Falls should be left untouched. That's not secret. That's correct, Your Honor, and I see my time's expired. Thank you. Thank you all. Very interesting case, and we appreciate the very helpful arguments of counsel. I think now we will stand and recess.
judges: Fisher, Tallman, Ezra